**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 14, 2023

**BY ECF**
The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *United States v. Jamil Hakime*, 22 Cr. 699 (AT)

Dear Judge Torres:

The Government respectfully submits this letter in advance of the July 19, 2023 sentencing of Jamil Hakime (the "defendant"). The defendant provided a powerful firearm to two young men who planned to use the weapon to shoot congregants at a synagogue in or around New York City. He gave them multiple rounds of ammunition, showed them how to use the gun, warned them to wipe his fingerprints from it, and drove them with the gun and bullets from Pennsylvania to the heart of Manhattan. Had law enforcement not noticed Brown's threatening online posts and interrupted the plan to "shoot up" a synagogue, this case perhaps would involve a defendant who set the stage for untold murders and monumental harm on New York's Jewish community, as well as the fabric of this City and nation. The defendant, meanwhile, has shown absolutely no remorse for his conduct, and separates himself from the serious consequences that could have flowed from his actions, much like he tried to do when he asked the young men to remove his fingerprints from the weapon he supplied them. Moreover, the need to send a message of general deterrence to those who would arm others and bring illegal guns into this District is extraordinarily high, particularly given the recent rise in hate crimes and antisemitic attacks across the City. The Court should impose the statutory maximum sentence of five years' imprisonment.

### A. Factual Background

1. Overview

This case arose from a plot involving 21-year-old Christopher Brown and 22-year-old Matthew Mahrer to attack one or more synagogues in New York City, in furtherance of an antisemitic agenda. In or about the early morning hours of November 18, 2022, Brown posted on Twitter his intention to "shoot up a synagogue," emphasizing, "This time I'm really gonna do it." (PSR ¶ 10).

That same day, after Brown published those posts, Brown and Mahrer sought to purchase a firearm and ammunition for that apparent purpose from the defendant, with whom Mahrer was

acquainted. The defendant picked up and drove Brown and Mahrer in the defendant's Range Rover from Manhattan to a house that the defendant owns in Pennsylvania, where the defendant retrieved a firearm (the "Firearm") and ammunition (the "Ammunition") for Brown and Mahrer. (*Id*. ¶ 12). The defendant then drove Brown and Mahrer back to Manhattan and gave them the Firearm and Ammunition. Later that night, law enforcement officers arrested Brown and Mahrer in Penn Station, thereby disrupting the threat the two men posed to the Jewish community in Manhattan. (*Id*.).

> 2. <u>Brown Threatens to "Shoot Up a Synagogue" and Travels to Manhattan to Acquire a Firearm</u>

Over the course of several days leading up to Friday, November 18, 2022, Brown posted a series of threatening messages online on Twitter, including: "Big moves being made on Friday," "Gonna ask a Priest if I should become a husband or shoot up a synagogue and die," "Goodbye friends," and "This time I'm really gonna do it." On November 18, because of those messages, law enforcement officers went to Brown's family residence and spoke with members of Brown's family. Brown's sister informed law enforcement that Brown was headed to Manhattan to meet a friend (Mahrer). Brown's sister further stated that Brown was a "Nazi" who "hated Jews."

> 3. <u>The Defendant Drives Brown and Mahrer from Manhattan to Pennsylvania to Acquire the Firearm and Ammunition</u>

In the afternoon on November 18, 2022, Brown met up with Mahrer in Manhattan. Mahrer then contacted the defendant, a 58-year-old resident of Manhattan, who has been employed since approximately 2014 by New York City's Administration for Children Services ("ACS") as a Youth Developmental Specialist in Manhattan. Just hours after Brown had posted on Twitter that he intended to shoot up a synagogue, the defendant drove his Range Rover to pick up Brown and Mahrer in Manhattan. (*Id*. ¶ 12). The defendant then drove Brown and Mahrer to a home co-owned by the defendant in Pennsylvania. During that ride, at approximately 5:39 p.m., and while the defendant, Brown, and Mahrer were together inside the defendant's Range Rover, a law enforcement officer contacted Brown by phone regarding his threatening online posts. Brown then deleted the threatening messages that he had posted on Twitter.

Shortly thereafter, the defendant, Brown, and Mahrer arrived at the defendant's house in Pennsylvania, where the defendant retrieved for Brown and Mahrer the Firearm and the Ammunition. The Firearm was a generation 5 Glock 17 with an extended magazine, which allows the firearm to hold up to thirty rounds of ammunition, and a weapon-mounted light and red dot optic device that allows a user to have better aim at his target. (*Id*. ¶ 19). The Ammunition included nineteen rounds of 9mm ammunition. (*Id*.). Brown and Mahrer paid the defendant approximately $650 for the Firearm and Ammunition via CashApp. (*Id*. ¶ 10).

After retrieving the Firearm and Ammunition, and after law enforcement contacted Brown after becoming aware of the potential threat, the defendant drove Brown and Mahrer back to Manhattan and gave them the Firearm and Ammunition. Brown and Mahrer then went to Mahrer's family's apartment in Manhattan (the "Mahrer Apartment") where they hid the Firearm and the Ammunition in Mahrer's bedroom before heading to Penn Station. (*Id*. ¶ 17).

4. <u>Brown and Mahrer are Arrested and the Firearm and Ammunition are Recovered</u>

That night, at Penn Station, both Mahrer and Brown were arrested and taken into state custody.[1] The defendant remained in close phone contact with Mahrer until just minutes before Mahrer's and Brown's arrests. (*Id.* ¶ 18). At the time of those arrests, law enforcement recovered a large hunting knife and a Swastika arm band from a bag that Brown was carrying, as depicted below:



Law enforcement officers also recovered from the Mahrer Apartment a backpack with the Firearm and Ammunition inside. (*Id.* ¶ 18). Below is a photograph of the Firearm:



---

[1] Mahrer and Brown were subsequently charged with firearms possession offenses under New York State law by the Manhattan District Attorney's Office ("DANY"). Specifically, Mahrer and Brown were both charged under New York State law with conspiracy to unlawfully possess a weapon. Mahrer was also charged with criminal possession of a weapon in the second degree, and Brown was also charged with weapons possession offenses and making terroristic threats. DANY's case against Mahrer and Brown remains pending. The defendant was never arrested or charged in connection with the DANY case.

Following his arrest, Brown provided a *Mirandized* statement to law enforcement in which he stated, among other things, that the defendant transported Mahrer and Brown to his Pennsylvania home to obtain the Firearm and Ammunition. While traveling to Pennsylvania with the defendant and Mahrer, Brown received a phone call from a law enforcement officer regarding his threatening online posts. Thereafter, the defendant and Mahrer taught Brown how to use the Firearm at the defendant's house in Pennsylvania. The defendant, according to Brown, also requested that Mahrer clean the Firearm to remove the defendant's fingerprints from the Firearm. Brown further stated that as a result of the phone call from law enforcement, he and Mahrer became concerned with having the Firearm in their possession and decided to bring the Firearm back to the Mahrer Apartment after they returned to Manhattan with the defendant, where they hid the Firearm in a backpack.

5.  The Defendant Offers to Sell Firearms to Another Convicted Felon and Discusses His Involvement With Firearms Trafficking in a Recorded Prison Call

In addition to providing the Firearm and Ammunition to Brown and Mahrer, the defendant also attempted to sell firearms to a convicted felon. On November 18, at approximately 3:32 p.m., while the defendant, Mahrer, and Brown were together in the defendant's Range Rover, Mahrer called an associate of his who was incarcerated at a state detention facility (the "Inmate"). The Inmate had been arrested in or about August 2021 for possessing firearms and was serving a 42-month state sentence for criminal possession of a weapon in the second degree. (*Id.* ¶ 19 n.1).

On the call, Mahrer told the Inmate that Mahrer was with "Jay," a reference to the defendant, and the Inmate asked Mahrer to put the call on speakerphone, which Mahrer did. (*Id.* ¶ 19). On that call, the defendant told the Inmate that "we're picking up the 43," referring to a Glock 43 firearm. The Inmate stated that he needed a 43 when he got out of jail, noting that "the 17 was rough." The "17" appears to be a reference to a Glock 17 firearm, the type of firearm that was recovered from the Inmate's residence in a building on Second Avenue in Manhattan (the "Second Avenue Apartment Building")—where the defendant also resided—during a judicially authorized search in August 2021.

During the call, the defendant further confirmed that "he has the connect" and can procure whatever type of firearm the Inmate wanted, stating, "I got everything now . . . I got the D, I got the C, name one of the letters in the alphabet," referring to various types of firearms. The defendant also stated, "I'm that [N word] in the building son, I took over your spot," an apparent reference to the fact that, following the Inmate's arrest, the defendant apparently took over the Inmate's "spot" for trafficking firearms at the Second Avenue Apartment Building. The defendant also stated that the Inmate should have given the defendant the guns for which the Inmate is currently incarcerated. Finally, the defendant stated that he had the "Gen 5 with the las[er] and all," which appears to be a reference to a generation 5 Glock 17 firearm with a red dot optic device—the exact type of firearm that the defendant supplied to Mahrer and Brown later that day.

6.  The Defendant Conceals Evidence of His Firearms Trafficking After Brown's and Mahrer's Arrests

On or about November 22, 2022, several days after Brown's and Mahrer's public arrests, law enforcement observed the defendant in the vicinity of the Second Avenue Apartment Building. (*Id*. ¶ 20). Two individuals, including the Inmate's apparent wife ("CC-1"), exited the building holding large black garbage bags, which appeared to be full, and handed those bags to the defendant, who placed them in the trunk of his Range Rover. The defendant then entered the Second Avenue Apartment Building and emerged carrying a black backpack, which he then brought with him inside the Range Rover. He drove off in the Range Rover onto the New Jersey Turnpike, in the direction of his house in Pennsylvania.

Shortly after the defendant and CC-1 were observed transferring bags out of the Second Avenue Apartment Building and into the Range Rover, the Inmate and CC-1 spoke on the phone. (*Id*. ¶ 22). On that recorded prison call, CC-1 informed the Inmate that the defendant was "in trouble" and that CC-1 had to "pack Jay up." It therefore appears that CC-1 packed up items and evidence associated with the defendant and his firearms trafficking activities that were located in the Second Avenue Apartment Building, in an effort to avoid law enforcement detection. CC-1 further stated that the defendant was "laying low." (*Id*.).

**B. Procedural History**

On December 2, 2022, the defendant was arrested and charged in a three-count Complaint with (1) conspiracy to transport a firearm interstate, in violation of Title 18, United States Code, Section 371; (2) interstate transport of a firearm, in violation of Title 18, United States Code, Sections 922(a)(3), 924(a)(1)(D), and 2; and (3) being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8). (Dkt. No. 1). That same day, the defendant was presented before United States Magistrate Judge Stewart D. Aaron, who detained the defendant after a lengthy bail hearing. The defendant has been detained at the MDC since that time.

On December 20, 2022, a grand jury in the Southern District of New York returned a three-count indictment (the "Indictment"), which charged the defendant with the same offenses as those set forth in the Complaint. (Dkt. No. 7).

On March 14, 2023, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pled guilty to Count One of the Indictment, namely, conspiracy to transport a firearm interstate. That count carries a statutory maximum term of imprisonment of five years, a maximum term of supervised release of three years, a maximum fine of $250,000, and a $100 mandatory special assessment.

At the plea, the defendant admitted to the following conduct:

> On or around November 18, 2022, I agreed with other people to violate federal law by unlawfully transporting a gun from Pennsylvania to New York. On that day, I drove two people from

New York City to Pennsylvania. The purpose of the trip was to pick up a gun, which I intended to sell to one of the passengers. I drove my two passengers to Pennsylvania, picked up the gun, and then drove it back to New York, specifically Manhattan, where I dropped off the passengers together with the gun. I am a resident of New York State and not a licensed dealer or collector of firearms. I knew at the time that it was wrong and illegal for me to agree with others to transport a firearm from Pennsylvania to New York.

(Dkt. No. 29 at 18-19).

On July 6, 2023, the defendant filed his sentencing submission (Dkt. No. 33), in which he argues for a sentence of time served, followed by two years of supervised release. The defendant argues that time served—that is, approximately eight months' imprisonment—is an appropriate sentence because of the conditions at MDC and the fact that the defendant has not been convicted of another crime since he was last released from prison in or about 1990. (*Id.* at 5). The defendant also claims that he "poses no risk to any person." (*Id.*).

On July 11, 2023, the U.S. Probation Office ("Probation") issued a final Presentence Investigation Report (the "PSR"). (Dkt. No. 35). In the PSR, Probation calculates the applicable Guidelines consistent with the calculation set forth in the Plea Agreement. (PSR ¶ 6). Pursuant to U.S.S.G. § 2X1.1(a), the base offense level for Count One is the base offense level for the substantive offense that is the object of the charged conspiracy, transporting a firearm interstate. (*Id.*). The Guideline applicable to transporting a firearm interstate is U.S.S.G. § 2K2.1. (*Id.*). Pursuant to U.S.S.G. § 2K2.l(a)(6), the base offense level for Count One is 14 because the defendant was a prohibited person at the time the defendant committed the instant offense. (*Id.*). After a two-level decrease for acceptance of responsibility, the defendant's total offense level is 12. (*Id.*). Because the defendant's prior criminal convictions occurred more than fifteen years ago, the defendant has zero criminal history points and is therefore in Criminal History Category I. (*Id.*). Accordingly, the Stipulated Guidelines Range is 10 to 16 months' imprisonment. (*Id.*). Probation recommends a top-of-the-Guidelines sentence of 16 months' imprisonment, followed by three years of supervised release.

**C. The Five-Year Statutory Maximum Term of Imprisonment is Warranted in This Case**

    1.  Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, a court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, and

the need for the sentence imposed to promote respect for the law, to provide just punishment for the offense, to adequately deter criminal conduct, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

    2.  <u>Discussion</u>

In this case, an above-Guidelines sentence of five years' imprisonment—the statutory maximum sentence—is the only sentence sufficient to adequately account for the factors set forth in 18 U.S.C. § 3553(a). The most salient factors here are the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to afford adequate deterrence to this defendant and to others, to protect the public from further crimes of the defendant, and to provide just punishment for the offense.

    a.  *The Nature and Circumstances of the Offense*

*First*, the maximum statutory sentence is necessary to reflect the gravity of the offense. Even viewed in a vacuum, the defendant's conduct was extremely serious. The defendant sold a firearm and ammunition for profit to Brown and Mahrer, two troubled young men. That Firearm was designed to have deadly impact. The Firearm had an extended magazine, which allowed the device to hold up to thirty rounds of ammunition, and contained a weapon-mounted light and red dot optic device, which permitted its user to have better aim at his target. The defendant not only sold that dangerous weapon to Brown and Mahrer, but he and Mahrer trained Brown on how to use it. And to conceal his involvement in the firearm's sale, the defendant also requested that Mahrer and Brown wipe his fingerprints from the weapon. Thus, the defendant's conduct—in and of itself—was extremely serious.

In determining an appropriate sentence, however, the defendant's conduct should be understood in the context of Brown and Mahrer's heinous plot. Although the defendant does not appear to have spearheaded their plan to attack a synagogue in New York, the defendant quickly became a critical part of it. The defendant aided Brown's plan to "shoot up a synagogue" by arming Brown and Mahrer with a powerful gun and many rounds of ammunition, and training Brown how to use the gun. The threats of the defendant's co-conspirators—had they not been prevented by the swift action of law enforcement—could have enacted grievous harm on the Jewish community. But for the quick intervention of law enforcement, the defendant's actions could have led to a tragedy on a monumental scale and could have devastated the lives of many people who were targeted solely for their religious beliefs and their desire to worship.

Whether or not the defendant agreed or sympathized with Brown's animus, he was complicit in enabling Brown and Mahrer to act on it. The defendant clearly knew, or should have known, of Brown's and Mahrer's hateful intent when the defendant trafficked the Firearm and Ammunition to them. The defendant spent hours driving Brown and Mahrer to and from Pennsylvania to acquire the Firearm and Ammunition. During that drive, while they were in the car together, Brown was contacted by law enforcement regarding his threatening Twitter posts, a voice call he received while in the vehicle with the defendant. It strains credulity to believe that the defendant was completely unaware of what that communication entailed. The defendant also maintained close phone contact with Mahrer up until minutes before Mahrer and Brown were

arrested at Penn Station with a Swastika arm band and large hunting knife in their possession—again demonstrating the unlikeliness that the defendant was wholly in the dark about what Brown and Mahrer were intending to do with the weapons he supplied them. Moreover, the defendant's decision to not only provide Brown and Mahrer with a deadly firearm, but to train Brown how to use it, and to give them rounds of ammunition to load the gun with, demonstrates that at a minimum, the defendant understood that they intended to use the Firearm and he made sure that they knew how to do it. Simply put, the defendant's actions endangered the lives of many and may have culminated in devastating consequences if not for the intervention of law enforcement.

Further, the defendant attempted to conceal the extent of his conduct. After Brown's and Mahrer's arrests, and prior to his arrest on the instant charges, the defendant appears to have cleared any evidence of his firearms trafficking activity from both his residence at the Second Avenue Building, and his residence in Pennsylvania, and to have enlisted co-conspirators to help him. This inference is strongly corroborated by the recorded calls between the defendant and the Inmate, during which the defendant discussed taking over the Inmate's gun trafficking business at the Second Avenue Building, and between the Inmate and CC-1, during which CC-1 revealed that the defendant was in trouble and intimated that she helped him pack up so that he could evade law enforcement. In essence, the defendant attempted to wipe his hands of his involvement in the scheme, in the same manner that he had instructed Brown and Mahrer to wipe his fingerprints from the Firearm.

Finally, the defendant's firearms trafficking was not limited to procuring the Firearm and Ammunition for Brown and Mahrer. While driving Brown and Mahrer to Pennsylvania to get the Firearm and Ammunition, the defendant also offered to procure firearms for the Inmate, an individual who had been recently convicted of illegally possessing a loaded firearm. The defendant assured the Inmate that the defendant could provide the Inmate with any firearm of the Inmate's choosing upon the Inmate's release from custody. The defendant also bragged to the Inmate about the fact that, following the Inmate's arrest, the defendant had taken over the Inmate's firearms trafficking spot at the Second Avenue Building, where the defendant and Inmate had both resided, indicating that the defendant's firearms trafficking operations extended throughout the area. In other words, the defendant, by his own admissions, was in the business of trafficking firearms and was willing to supply weapons to not only Mahrer and Brown—two young individuals, at least one of whom had a clear intention to inflict harm on the Jewish community—but also to the Inmate, another convicted felon, whom the defendant knew was serving time for unlawfully possessing a loaded firearm.

In sum, the applicable Guidelines of 10 to 16 months' imprisonment are woefully inadequate to reflect the nature and circumstances of this offense. A statutory maximum sentence of five years' imprisonment is the only sentence sufficient to reflect the dangerousness and seriousness of the defendant's conduct.

### b. *Deterrence*

*Second*, both general and specific deterrence are of significant concern in this case. It is clear that, contrary to the defendant's assertion in his submission, he does pose a very serious risk to others. Neither the defendant's arrest in this case, nor his recent period of pretrial detention,

appear to have impressed upon him the seriousness of his offense. Nowhere in his sentencing submission does the defendant express remorse or take any responsibility for his conduct. He fails to acknowledge the fact that he supplied a dangerous weapon and ammunition to two young men who sought a gun immediately after one of them publicly stated his desire to commit a deadly crime of hate. And even assuming, against all logic, that the defendant did not know at the time what Brown and Mahrer specifically planned to do with the defendant's gun, the defendant has since been made aware of that horrifying reality. The defendant can no longer disclaim knowledge that his own actions could have resulted in an unimaginable tragedy on the scale of what happened to the Jewish Community at the Tree of Life Synagogue in Pittsburgh four years prior.[2] Moreover, the defendant takes no responsibility for his willingness to provide another convicted felon with weapons as soon as that felon was released from jail. A statutory maximum sentence is therefore necessary to deter the defendant from similar conduct which endangers the entire community, and to protect the public from further crimes by the defendant and others.

In addition to specific deterrence, a sentence of five years' imprisonment is necessary to afford adequate deterrence to others who would seek to enable hate-motivated violence. In an atmosphere of rising hate crimes and antisemitism, general deterrence is critical to preventing would-be attackers—or those who would consider arming them—from perpetrating deadly attacks on the Jewish community and other vulnerable religious or ethnic populations.[3] A maximum statutory sentence is therefore necessary to send a message of deterrence that violent attacks motivated by hate, or those who would enable such attacks, will not be tolerated.

c. *The Defendant's History and Characteristics*

*Third*, the defendant's history and characteristics warrant the statutory maximum sentence. While the defendant characterizes his conduct in this case as aberrant, it was plainly not. The instant offense represents the defendant's eighth known criminal conviction, including his third felony conviction. The defendant's criminal history, although dated and therefore not accounted for in his Guidelines calculation, includes two prior felony convictions for burglary in the second degree and attempted robbery in the second degree and serious terms of imprisonment ranging from one to three years' and 18 to 54 months' imprisonment. The defendant has clearly failed to learn from these prior convictions. Further, despite evading law enforcement detection for a number of years, the defendant has been reengaged with criminal activity, as reflected in the statements the defendant made on a recorded call to the Inmate on November 18. The defendant's

---

[2] *See Jury Convicts Man in Killing of 11 in Pittsburgh Synagogue*, N.Y. Times (June 16, 2023), *available at* https://www.nytimes.com/2023/06/16/us/pittsburgh-synagogue-shooting-verdict.html.

[3] *See*, *e.g.*, *Survey finds 'classical fascist' antisemitic views widespread in U.S.*, Wa. Post (Jan. 12, 2023), *available at* https://www.washingtonpost.com/dc-md-va/2023/01/12/antisemitism-anti-defamation-league-survey/; *Antisemitic hate crimes rise in major cities*, Axios (Dec. 17, 2022), *available at* https://www.axios.com/2022/12/17/antisemitic-hate-crimes-rise-in-major-cities; *Antisemitic incidents hit a record high in 2021. What's behind the rise in hate?*, PBS (Apr. 29, 2022), *available at* https://www.pbs.org/newshour/show/antisemitic-incidents-hit-a-record-high-in-2021-whats-behind-the-rise-in-hate.

prior probation and parole revocations are also concerning, and as noted by Probation (PSR at 26), strongly suggest that the defendant is not amenable to community supervision.

Equally troubling is that at the time of the instant offense, the defendant was a Youth Developmental Specialist at ACS in Manhattan. As reflected on ACS's website, a Youth Developmental Specialist is supposed to, among other things, work with young people in detention facilities, to provide them with "safe and secure supervision," "serve as a role model," work as part of a team to support positive and healthy youth development, and manage conflict and youth behavior safely, including by using de-escalation and restraint techniques as necessary. The defendant's conduct in this case shows that he is the diametric opposite of what he claims to be and do in this world. Far from providing safety and supervision to young, troubled individuals, the defendant in this case was willing to provide firearms to young men who wanted to shoot up a synagogue and to an incarcerated felon who is currently serving time for unlawful firearm possession. As noted by Probation, "it is concerning that an individual in a position of trust, working with impressionable at-risk youth, was involved in the trafficking of a firearm and ammunition to individuals with intentions, whether [the defendant] was aware of [Brown's and Mahrer's] plan or not, to use them for mass destruction." (PSR at 26.). Indeed, even if the defendant had not been aware of Brown's and Mahrer's specific intentions for the weapons he provided them, which he clearly appears to have been, the defendant was uniquely aware of the potential harm that such dangerous weapons—an operable firearm and extended magazine with a thirty-round capacity—can cause when placed in the hands of troubled young men. That someone charged with the responsibility to care for and guide troubled youth was engaging in this highly dangerous conduct is chilling.

Thus, an above-Guidelines sentence is also necessary in light of the defendant's history and characteristics and to accomplish what the defendant's prior interactions with the criminal justice system did not: deter the defendant from future crimes.

In sum, the seriousness of the defendant's conduct—including his willingness to provide firearms to two young men who were set on perpetrating a deadly hate crime, as well as to a convicted felon—and the need for the sentence imposed to provide just punishment, to deter the defendant from future crimes, and to protect the public from any such future crimes, particularly in light of the defendant's total lack of remorse, warrant the statutory maximum sentence of five years' imprisonment. Such a sentence is necessary to send a clear message to the defendant and to others who would consider unlawfully possessing and trafficking firearms into New York City (or anywhere) and enabling hate crimes that doing so will carry the most serious of consequences.

### D. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose the statutory maximum sentence of five years' imprisonment. Such a sentence is necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By: /s/ _____
  Mitzi S. Steiner
  Sarah L. Kushner
  Assistant United States Attorneys
  (212) 637-2284 / 2676

cc:    Martin Cohen, Esq. (by ECF)